CASENAVE, PETICIONARIO Y AFELADO, *v.* GUZMÁN, DEMANDADO Y APELANTE.

APELACIÓN procedente de la Corte de Distrito de San Juan, Sección 1ª., en un recurso sobre *mandamus.*

No. 1281.—Resuelto en julio 30, 1915.

PROTOCOLOS NOTARIALES—INSPECCIÓN DEL PÚBLICO—INTENCIÓN DEL LEGISLADOR—ORDENES GENERALES NOS. 150 Y 177 DE 1899, Y NO. 8 DE 1900—REGLAMENTO ORGÁNICO DEL NOTARIADO.—Atendido el texto español, así como el inglés,

·de las Ordenes Generales Nos. 150, sección 1ª., y 177 de 26 de septiembre y 11 de noviembre de 1899, respectivamente, en relación con la No. 8 de 16 de enero de 1900, no fué la intención del Gobierno Militar establecer el derecho de inspeccionar los protocolos notariales o despojarlos de su carácter de reservados o secretos·que les reconocía la ley y Reglamento Orgánico del Notariado entonces vigentes.

Los hechos están expresados en la opinión.

El apelante compareció en nombre propio.

Abogados del apelado: *Sres. Rafael López Landrón* y *Juan Gregory.*

EL JUEZ PRESIDENTE SR. HERNÁNDEZ emitió la opinión del tribunal.

Con fecha 4 de enero del corriente año José María Casenave y García de Orozco formuló petición jurada al Juez de la Corte de Distrito de San Juan, Sección 1ª., para que expidiera auto de *mandamus* de carácter perentorio o en su defecto condicional al notario Juan de Guzmán Benítez, a fin de que exhibiera y pusiera de manifiesto a examen o inspección del solicitante la escritura matriz del testamento abierto No. 163 de 2 de noviembre de 1914 otorgado por Isabel Márquez y Crosas, de la que el peticionario dice ser pariente colateral consanguíneo, y como tal, según dice, con interés legítimo en la herencia que pudiera dejar abintestato la expresada señora, por carecer ésta de ascendientes y descendientes.

Expedido con carácter definitivo o perentorio por resolución de 18 de enero de 1915 el auto de *mandamus* solicitado, después de oído el demandado, interpuso éste recurso de apelación contra dicha resolución, sometido a nuestra consideración y decisión.

Invócase por el peticionario como fundamento de su pretención la Orden General Militar No. 150 de 26 de septiembre de 1899, Sección 1., aclarada y ampliada por la No. 177 de 11 de noviembre de 1899 y no derogada, en su sentir, expresa ni tácitamente por ninguna ley posterior.

La Orden General No. 150 dispone:

''I. En adelante los archivos de todos los tribunales, magistraturas, notarías, registros, municipios y demás oficinas públicas, esta-

rán accesibles a la inspección del público, durante las horas de despacho.

"II. Todos los funcionarios o guardianes encargados de dichos archivos facilitarán copias legalizadas de los mismos a cualquiera que las solicitare, mediante el pago de los siguientes derechos:

"Por cada folio de traslado de un expediente, 15 cent. m. americana.

"Por cada legalización de un traslado, 25 cent. m. americana."

El texto inglés es el siguiente:

"*I. Hereafter the records of all courts, magistrates, notaries, registrars, municipalities, and other public offices shall be open to the inspection of the public during office hours.*

"*II. All officers or custodians in charge of such records shall furnish officially certified copies thereof to any person who may make application therefor upon payment of the following fees:*

"*For each folio of transcript of a record, 15 cents, Am. Cy.*

"*For each official certification of a transcript, 25 cents, Am. Cy.*"

La otra Orden General No. 177, aclaratoria de la anterior ya transcrita, está concebida en los términos siguientes:

"La palabra '*records*' empleada en la Orden General No. 150, serie corriente, de este Cuartel General, así como su traducción 'archivos' en la versión castellana, deberá entenderse que incluye toda clase de expedientes que directa o indirectamente se relacionen con cualquier asunto cuya documentación deba archivarse, ya esté terminado o pendiente de resolución."

El texto inglés de la Orden General No. 177 es el que transcribimos a continuación:

"*The word 'records' as used in General Order, No. 150, current series, these Headquarters, and translated in the Spanish copy as 'archivos' is intended to include all documents* (expedientes) *of every character which are connected with or relate to any case of record whether concluded or still pending.*"

La traducción literal al español del texto inglés de la Orden No. 177 es la siguiente:

"La palabra '*records*' según está usada en la Orden General No. 150, serie corriente, de este Cuartel General, y traducida al texto

español por la de 'archivos,' es entendido que incluye todos los documentos (expedientes) de cualquier carácter, que tengan conexión o relación con cualquier caso de record, esté concluído o aún pendiente."

El texto inglés de la Orden General No. 177 nos da la interpretación auténtica de la palabra '*records*' usada en la otra Orden General No. 150. Los archivos a que esta última se refiere son los comprensivos de documentos de cualquier carácter que guardan conexión o relación con algún caso de récord terminado o pendiente.

Es evidente que las escrituras de un protocolo no puede decirse que tengan conexión o relación con algún caso de récord terminado o pendiente.

Opinamos, pués, atendido el texto así español como inglés de las dos Ordenes Generales Nos. 150 y 177 que no fué la intención del gobierno militar establecer el derecho de inspeccionar los protocolos notariales.

Tal derecho no había sido reconocido por la Ley Notarial de España antes vigente, aplicada a esta isla por Real Decreto de 29 de octubre de 1873, cuyo artículo 32, entre otros preceptos, contiene el siguiente:

"Los notarios no permitirán tampoco sacar de su archivo ningún documento que se halle bajo su custodia por razón de su oficio, ni dejarán examinarlo en todo ni en parte, como tampoco el protocolo no precediendo decreto judicial, sino a las partes interesadas con derecho adquirido, sus herederos o causahabientes. En los casos, sin embargo, determinados por las leyes, y en virtud de mandamiento judicial, pondrán de manifiesto en sus archivos el protocolo o protocolos, a fin de extender en su virtud las diligencias que se hallen acordadas."

Si hubiera sido la intención del gobierno militar despojar los protocolos de su carácter de reservados o secretos que les reconocía el artículo 47 del Reglamento Orgánico del Notariado, lo hubiera manifestado por modo expreso y sin género alguno de duda. Es necesario reconocer que la Orden General No. 150 después de aclarada por la posterior No. 177 dejó al menos muy dudoso ese derecho de inspección y en caso

de duda no puede haber derogación de ley anterior clara y manifiesta. Tampoco la Orden General No. 150 contiene la cláusula derogatoria que es usual cuando se crean nuevos derechos en conflicto con leyes anteriores. Parécenos que la autoridad militar con poder legislativo entonces, no tuvo la intención de establecer una reforma tan radical como la de que se trata en los protocolos notariales, y que de haber sido esa su intención, hubiera empleado un lenguaje más específico.

Aún más, la Orden General No. 8 de 16 de enero de 1900 dice así:

"Las disposiciones de 'Ordenes Generales,' No. 150, enmendadas por 'Ordenes Generales,' No. 177 y 198, serie de 1899, de este Cuartel General, se propone sean aplicables únicamente a las copias oficiales de documentos archivados en las oficinas públicas, conforme en ellas se indica, y a los certificados oficiales (legalizaciones) de los mismos, no debiendo entenderse revocado por dichas disposiciones el arancel notarial según fué modificado por 'Ordenes Generales,' No. 11, serie de 1899, de este Cuartel General, insertas en la 'Gaceta Oficial' de febrero 1°., 1899."

A las Ordenes Generales Nos. 150 y 177 nos hemos referido anteriormente. La Orden General No. 198 dispuso entre otras cosas, que los derechos recaudados por copias sacadas de los archivos públicos (*official records*) y legalización de las mismas, se acreditarían por medio de sellos fiscales que se fijarán en cada documento legalizado.

Como se ve, la Orden General No. 8 explica claramente que si bien la sección 2ª. de la Orden General No. 150 fija los derechos que han de exigir todos los funcionarios o guardianes encargados de los archivos a que se refiere la sección 1ª. por la expedición de copias legalizadas de los mismos, fué la intención del legislador que el precepto de la ley fuera aplicable únicamente a las copias oficiales de documentos archivados en las oficinas públicas y a los certificados oficiales de los mismos, no debiendo entenderse revocado el arancel notarial.

La sección 2ª. de la Orden General No. 150, no obstante su carácter general debía referirse únicamente a copias oficiales de documentos archivados en las oficinas públicas y a los certificados oficiales de los mismos, pero no a copias y certificados expedidos por notarios, y siendo ello así, si el legislador claramente expresó que la sección 2ª. de la Orden General No. 150 no obstante su letra era inaplicable a documentos notariales, también nosotros podemos deducir que tampoco la sección 1ª. era aplicable a esos documentos y que de ser aplicable lo sería únicamente a los archivos públicos que el notario tuviera en su poder, si es que los tenía.

Y no es de alegar que con la interpretación dada a la sección 1ª. de la Orden General No. 150 quedaría ésta sin virtualidad alguna en cuanto a los notarios si éstos no tienen archivos, pues también carece de efecto en cuanto a los archivos de magistrados, pues no son éstos sino los tribunales los que los tienen, y ya la Orden General No. 150 en su sección 1ª. establece que en adelante los archivos de todos los tribunales estarán accesibles a la inspección del público durante las horas de despacho.

Por las razones expuestas es de revocarse la resolución apelada.

*Revocada la resolución apelada y declarada*
*sin lugar la solicitud de* mandamus.

Juez concurrente: Sr. Asociado Wolf.

El Juez Asociado Sr. Hutchison firmó "conforme con el resultado."

El Juez Asociado Sr. del Toro disintió.

El Juez Asociado Sr. Aldrey no intervino.

OPINIÓN CONCURRENTE DEL JUEZ ASOCIADO SEÑOR HUTCHISON.

Este caso me correspondió por el orden regular de distribución. El memorándum de opinión que acerca del mismo redacté, no fué enteramente satisfactorio para la mayoría del tribunal. Sin crítica alguna para la muy autorizada opi-

nión de la mayoría, prefiero fundar mi decisión, en primer
término, en los fundamentos que fueron consignados al informar sobre el caso. Estoy autorizado para decir que el Juez
Asociado Sr. Wolf está de acuerdo no solamente con la opinión
del tribunal, sino también con las consideraciones principales
del memorándum que fué sometido originalmente. Este es
como sigue:

El peticionario y apelado requirió al demandado y apelante, que es un notario público, para que le permitiera inspeccionar o examinar la escritura matriz de un testamento
abierto, otorgado por doña Isabel Márquez y Crosas en 2 de
noviembre de 1914, No. 163 del protocolo.

El apelante, demandado en la corte inferior, se negó a
consentir dicho examen y la Corte de Distrito de San Juan,
a solicitud del peticionario y apelado, expidió un auto de *mandamus,* siendo la única cuestión que aparece envuelta en este
caso según la misma ha sido presentada razonablemente por
el apelante en su alegato, ''si cualquier persona que no alegue tener interés en un documento notarial tiene derecho a
examinarlo y debe el notario consentir ese examen e investigación.''

Antes del cambio de soberanía el Notariado en Puerto
Rico se regía por la Ley Notarial de España, que fué hecha
extensiva a Puerto Rico por decreto de 29 de octubre de 1873.

Los artículos 32 y 36 de dicha ley disponían, entre otros
particulares, lo siguiente:

&ast;    &ast;    &ast;    &ast;    &ast;    &ast;    &ast;

''Los notarios no permitirán tampoco sacar de su archivo ningún
documento que se halle bajo su custodia por razón de su oficio, ni
dejarán examinarlo en todo ni en parte, como tampoco el protocolo
no precediendo decreto judicial, sino a las partes interesadas con
derecho adquirido, sus herederos o causahabientes. En los casos, sin
embargo, determinados por las leyes, y en virtud de mandamiento
judicial, pondrán de manifiesto en sus archivos el protocolo o protocolos, a fin de extender en su virtud las diligencias que se hayan
acordado.

"Art. 36.—Los protocolos pertenecen al Estado, y los notarios los conservarán con arreglo a las leyes, como archiveros de los mismos y bajo su responsabilidad."

También el Reglamento Orgánico del Notariado que regía en Puerto Rico disponía en su artículo 47 que "por punto general, todos los protocolos son secretos."

El fin principal e intención de la ley de proteger el carácter privado y confidencial que tiene la relación contractual contra la inútil e irresponsable curiosidad, así como de la investigación viciosa y mal intencionada de todas y cada una de las personas qu no tengan interés legítimo en ella, y por tanto derecho a ser informados de la materia objeto del documento notarial, se nota en seguida. Si se considera que el protocolo es propiedad pública, la santidad de su contenido ha sido sin embargo ciertamente reconocida y protegida eficazmente. Se niega en absoluto todo acceso al mismo a aquellas personas cuyo interés o derecho no se acredite, bien por la índole y condiciones del documento, o por virtud de una orden judicial.

El código en su artículo 675, equivalente al 667 del Código Español, define el testamento como "el acto por el cual una persona dispone para después de su muerte de todos sus bienes, o de parte de ellos." Es "absolutamente un acto personalísimo," y sus disposiciones "son esencialmente revocables." (Artículos 678 y 727, correspondientes a los 670 y 732 del Código Español.) El artículo 682 de nuestro código, equivalente al 674 del Código Español, prescribe que "el que con dolo, fraude o violencia impidiere que una persona, de quien sea heredero abintestato, otorgue libremente su última voluntad, quedará privado de su derecho a la herencia, sin perjuicio de la responsabilidad criminal en que haya incurrido." Y el artículo 665, Código Español 657, expresa que "los derechos a la sucesión de una persona se trasmiten desde el momento de su muerte." Claramente que no fué la intención de los fundadores del código el que se diera publicidad al contenido de un testamento durante la vida del testador.

Que las mismas razones en que se funda el celoso miramiento de la ley notarial del derecho al secreto en materias de contrato son de aplicación *a fortiori* al caso de un testamento o última voluntad, es un hecho que también resulta bastante claro.

Durante el período del Gobierno Militar en Puerto Rico que siguió inmediatamente al cambio de soberanía fueron promulgadas las Ordenes Generales siguientes:

La No. 11 de enero 29, 1899, reduciendo los aranceles notariales, derogando ciertas partidas y dejando otras en vigor, incluyendo las Nos. 16 y 17, relativas a los derechos por copias de documentos originales.

La No. 150, de septiembre 26, 1899, dispone:

"I. En adelante los archivos de todos los tribunales, magistraturas, notarías, registros, municipios y demás oficinas públicas, estarán accesibles a la inspección del público durante las horas de despacho.

"II. Todos los funcionarios o guardianes encargados de dichos archivos facilitarán copias legalizadas de los mismos a cualquiera que las solicitare, mediante el pago de los siguientes derechos:

|  | Moneda americana |
|---|---|
| "Por cada folio de traslado de un expediente | $0.15 |
| "Por cada legalización de un traslado | .25" |

La No. 177, de noviembre 11, 1899, aclaratoria de la No. 150, *supra,* prescribe que:

"La palabra '*record*' empleada en la Orden General No. 150, serie corriente, de este Cuartel General, así como su traducción 'archivos' en la versión castellana, deberá entenderse que incluye toda clase de expedientes que directa e indirectamente se relacionen con cualquier asunto cuya documentación deba archivarse, ya esté terminado o pendiente de resolución."

La No. 198, de diciembre 2, 1899, dispone:

"I. Los derechos recaudados por copias sacadas de los archivos públicos y legalización de las mismas, establecidos por el párrafo II, Ordenes Generales No. 150, y párrafos II y XXI, Ordenes Generales No. 176, serie corriente, de este Cuartel General, se acreditarán por medio de sellos fiscales que se fijarán en cada documento legalizado. * * *"

La No. 8, de enero 16, 1900, prescribe:

"Las disposiciones de Ordenes Generales No. 150, enmendadas por Ordenes Generales No. 177 y 198, serie de 1899, de este Cuartel General, se propone sean aplicables únicamente a las copias oficiales de documentos archivados en las oficinas públicas, conforme en ellas se indica, y a los certificados oficiales (legalizaciones) de los mismos, no debiendo entenderse revocado por dichas disposiciones el arancel notarial según fué modificado por Ordenes Generales No. 11, serie de 1899, de este Cuartel General, insertas en la Gaceta Oficial de. febrero 1, 1899.''

Cualquier esfuerzo serio y persistente- para desarrollar una teoría razonable, o llegar a una conclusión definitiva, fija y satisfactoria respecto al verdadero significado, objeto real y resultado positivo de las Ordenes Militares de referencia, y particularmente de las Nos. 150 de 1899 y 8 de 1900, considerando cada una en su totalidad a la luz de la otra, y ambas con relación especial al efecto legal, si alguno tienen, sobre el artículo 32 de la Ley Notarial, en manera alguna conviene al estado sereno de la mente que debe caracterizar a toda deliberación judicial. Alega el apelante que las palabras ''archivos de todos   *   *   *   notarías'' no se refieren al protocolo notarial, sino que se ''usaron evidentemente con relación a los récords que guardan los notarios en los Estados Unidos, donde no existe el protocolo en la forma que en Puerto Rico.'' Indicando como indica esta última observación una imaginación vigorosa, pero forzada, meramente sirve para aclarar la gran dificultad de poder explicar el lenguaje en cuestión mediante alguna teoría que elimine el protocolo notarial.

Por otra parte, es evidente por sí mismo que si con las palabras ''archivos de todos   *   *   *   notarías,'' del párrafo I, se hace referencia a los protocolos, entonces las palabras ''dichos archivos'' del párrafo II, a su vez incluyen necesariamente a dichos protocolos; y vice-versa, si ''dichos archivos'' no comprende los protocolos, entonces ''los archivos de todos   *   *   *   notarías,'' *supra,* tienen inevitablemente

que referirse a 'otros que no sean los protocolos notariales, o ser eliminados completamente por carecer en absoluto de significación. Sin embargo si la Orden General No. 8 tiene algún significado, se nos dice en sustancia que el párrafo II de la Orden General No. 150 no hace referencia alguna a los protocolos notariales. Ni está limitado el lenguaje al segundo párrafo de dicha Orden General anterior, sino que se refiere en los términos más amplios a "las prescripciones de las Ordenes Generales No. 150," etc. Si cualquier notario en el año 1900 se hubiera quejado al Comandante Militar de que por el hecho de haber interpretado erróneamente algún individuo mal enterado la Orden General No. 150, tal como fué enmendada para derogar el artículo 32 de la Ley Notarial, solicitaba inspeccionar la escritura matriz de un testamento hecho por un testador que aun no había fallecido y que era probable que fuera amparado por las cortes en sus esfuerzos para violar la santidad de dicho documento, en tal caso podría haberse decretado inmediatamente otra orden aclaratoria, lo que parece enteramente razonable suponerlo así, explicando después de hacer alusión a las órdenes anteriores, que "como en ellas se indica" jamás fué la intención hacer referencia a los protocolos notariales. Y, sea esto como fuere, el principio fundamental que sirve de base a la regla de *noscitur a sociis* parece ser de aplicación en un sentido ámplio y sostener una conclusión semejante y más o menos lógica.

Pero la decisión de este caso no estriba necesariamente en la cuestión relativa a la derogación del artículo 32 de la Ley Notarial por la Orden General No. 150, y para los fines de esta opinión muy bien podríamos admitir, aunque no lo admitimos, que la corte de distrito no cometió error alguno en su resolución sobre este aspecto del caso.

La ley para reglamentar la presentación de evidencia en los procedimientos civiles, aprobada en marzo 9 de 1905, y

citada por el juez sentenciador en apoyo de las conclusiones a que llegó, prescribe lo siguiente:

"Art. 44.—Los documentos son de dos clases:

"1. Públicos; y

"2. Privados.

"Art. 45.—Son documentos públicos:

"Los que se determinan en el artículo 1184 del Código Civil.

"Art. 46.—Son privados todos los demás documentos.

"Art. 47.—Todo ciudadano tiene derecho a inspeccionar y sacar copia de cualquier documento público de Puerto Rico, *salvo lo expresamente dispuesto en contrario por la ley.*

"Art. 48.—Todo funcionario público bajo cuya custodia obrare algún documento público, está en la obligación de facilitar, al requerírsele, copia certificada del mismo, mediante el pago de los derechos legales correspondientes, y dicha copia será admisible como evidencia en los mismos casos y con igual efecto, que el escrito original.

"Art. 49.—Los documentos públicos se dividen en cuatro clases:

"1. Leyes.

"2. Protocolos judiciales.

"3. Otros documentos oficiales.

"4. Archivos públicos de documentos públicos o privados, llevados en Puerto Rico."

La Ley para regular el ejercicio de la profesión notarial en Puerto Rico, aprobada en marzo 8, 1906, contiene los preceptos siguientes:

"Sec. 6.—El notario redactará escrituras originales, expedirá copia de las mismas y formará protocolo.

"Sec. 25.—Al librarse una copia se hará constar por nota extendida al pie o al margen de la escritura original de que aquella se libre, consignándose el nombre de la persona a quien se haya librado y la fecha. Esa nota será firmada por el notario.

"Sec. 34.—Los protocolos pertenecen al Pueblo de Puerto Rico, pero los notarios los conservarán como archiveros de los mismos y bajo su responsabilidad con arreglo a las prescripciones de esta ley.

"Sec. 38.—Los jueces de las cortes de distrito visitarán, por lo menos una vez cada año, las notarías comprendidas en su distrito, con el fin de examinar los protocolos y ver si éstos están llevados con arreglo a la ley. Los jueces de las cortes de distrito podrán corregir disciplinariamente, con multa que no exceda de 500 dólares, cual-

quier falta que se haya advertido, siempre que ésta no constituya delito, en cuyo caso se procederá inmediatamente a la formación de la correspondiente causa.

"Sec. 41.—La Ley del Notariado y su reglamento quedan por la presente derogados. Y todas las demás leyes, órdenes y decretos, que se opusieren a la presente, quedan también derogados."

Debe notarse que la definición de documentos públicos contenida en la ley de evidencia no es nueva. Tanto antes como ahora los artículos 1216 y 1217 del Código Civil Español, correspondientes a los 1184 y 1185 de nuestro código, definían como documentos públicos los autorizados por un notario, o empleado público competente, disponiendo que aquellos en que intervenía el notario público se regirían por la legislación notarial. Existe también cierta diferencia que debe tenerse en cuenta entre los documentos públicos de la ley notarial y los del Código Civil y el sentido en que la palabra "público" se emplea quizás más frecuentemente. Las palabras "público' y "privado," según son aplicadas a los documentos, no indican necesariamente publicidad en contraposición a secreto. Scaevola, tomo 20, página 208. Sin embargo, no tenemos necesidad de basar nuestra resolución en tal distinción. Cualquier efecto que de otro modo pudiera haber tenido la ley de evidencia, sobre el cual insiste algo la corte inferior, respecto al artículo 32 de la Ley Notarial, queda enteramente anulado por la excepción contenida en el artículo 47, puesto que en el referido artículo 32 "la ley expresamente prescribe otra cosa."

Pero el artículo 32 fué indiscutiblemente derogado en unión de los demás preceptos de la Ley Notarial y sus reglamentos por el artículo 41 de la Ley de 1906. De modo, que por lo menos desde 1906 hasta 1914, podría haberse alegado con cierta razón el derecho a la inspección. Pero de esto no ha de deducirse necesariamente, y no es nuestra intención expresar, que aun durante dicho período los protocolos notariales se encontraban abiertamente y sin reserva alguna

sujetos a la inspección de cualquier ciudadano.　Eso, sin embargo, también es ajeno a la cuestión.

En el año 1914 fueron enmendados los artículos 25 y 38 de la Ley de 1906, *supra,* en la forma siguiente:　(La bastardilla es nuestra; *"authors"* intercalado.)

"Art. 25.—*Las partes, sus causantes* (authors) *y causahabientes en la materia del contrato, y cualquier persona que aparezca interesada en el mismo, podrán solicitar y obtener del notario las oportunas copias de las escrituras matrices.　Cualquier otra persona podrá también obtener copia de un documento notarial mediante petición justificada ante una corte de distrito, que a su razonable discreción podrá librar una orden a ese efecto.*

"Al librarse una copia se hará constar por nota extendida al pie o al margen de la escritura original de que aquélla se libre, consignándose el nombre de la persona a quien se haya librado y la fecha. Esa nota será firmada por el notario.

"Art. 38.—Los jueces de las cortes de distrito visitarán por lo menos una vez cada año las notarías comprendidas en su distrito, con el fin de examinar los protocolos y ver si en éstos se han cumplido las formalidades de las leyes y si están llevados con arreglo a la presente ley.　Los jueces de las cortes de distrito podrán corregir disciplinariamente, con multa que no excederá de 500 dólares, cualquier falta que hayan advertido, siempre que ésta no constituya delito, en cuyo caso se procederá inmediatamente a la formación de la correspondiente causa.　*No será permitido la investigación ni examen de ningún protocolo notarial a ningún otro funcionario a menos que fuere debidamente autorizado por mandamiento expedido por una corte de justicia."*

Leyes de 1914, página 151.

Se ve con bastante claridad que los únicos cambios que se notan consisten en el nuevo párrafo que ha sido incluído en el artículo 25 y la frase final que se ha adicionado al artículo 38.　De un examen cuidadoso de la nueva materia adicionada con el artículo 32 de la Ley del Notariado de España, que fué derogado, llegamos inevitablemente a la conclusión de que la legislatura, o tuvo la intención de subsanar una omisión inadvertida de incluir esta última entre otros particulares de la ley anterior, que fué conservada y continuó en vigor en

una forma más o menos modificada en las leyes a que hemos hecho referencia y en otras leyes, o en todo caso revalidar el principio encarnado en el lenguaje de aquel artículo. Al menos la enmienda hecha al artículo 25 no puede ser explicada satisfactoriamente por ninguna otra teoría. *Expressio unius est exclusio alterius.* El nuevo párrafo claramente significa un restablecimiento substancial del antiguo artículo, o nada quiere decir. No podía ser otro el objeto.

Debe revocarse la sentencia dictada por la corte de distrito.